Thank you, Your Honor. Charlotte Taylor on behalf of Appellant Cross Appellee Guardian Flight LLC. I've reserved three minutes for rebuttal. So I'm happy to address any questions that Your Honors may have about the issues raised by the officials in their cross appeal. But in our view, those arguments are foreclosed by numerous existing precedents. Their airline deregulation arguments are foreclosed by this court's decisions in Farrell and Watson. And they're also in conflict with, for example, Judge Wilkinson's opinion for the Fourth Circuit in Cheatham. And their McCarran-Ferguson argument respecting the payment provision is in direct conflict with the Eleventh Circuit's opinion in Bailey. So I'm going to primarily focus on the application of the McCarran-Ferguson Act to the membership prohibition, which was the issue raised in our appeal. Guardian Flight's membership program is a straightforward prepaid services agreement directly between a consumer and a provider. The consumer pays a membership fee, and then if she receives transport from Guardian Flight, Guardian Flight then will cancel a portion of the debt that she would otherwise owe to it. There is no indemnification and no guarantee of service. As two separate Supreme Court cases made clear, no one at the time the McCarran-Ferguson Act was passed thought that the business of insurance included prepaid medical services plans like this one. No federal court of appeals has ever held that a prepaid service or debt cancellation agreement directly between a consumer and a service provider is the business of insurance. And in fact, in Taylor, this court held the opposite, that a debt cancellation agreement that is closely analogous to our membership program was not the business of insurance. There is quite simply no federal law authority supporting the state official's position. And tellingly, they not only have never articulated a federal law rule, they've never even proposed a workable rule that would distinguish the membership program in this court case from the numerous non-insurance products that we listed in our opening brief. The closest they come is a proportionality test that's squarely foreclosed by this court's opinion in Taylor. So, we actually think that Taylor resolves this membership prohibition issue. And I'd like to make three points about Taylor. First, Taylor recognizes exactly the portion of the Royal Drug opinion that we think is crucial in this case. Royal Drug held that corporations organized for the purposes of providing their members with medical services were not considered to be engaged in the business of insurance, in the insurance business at all, in 1945. Then, Taylor recognized that the term the business of insurance can't be construed to give states any additional authority beyond what they possessed in 1945. But in fact, the act was an effort to turn back the clock, not to give states expansive new authority. And then, by analogy, Taylor goes ahead and reasons that the same must go for banks. But we don't even have to get to the analogy that Taylor employed, because here we're right within the scope of that Royal Drug holding that Taylor focuses on. The second point I'd like to make about Taylor is that it recognizes that where a service provider itself is offering debt cancellation, that's not the business of insurance, because the provider, or in that case the bank, doesn't take any investment risk or make any payment to the borrower as a state. And I quote from the opinion, the debt is simply extinguished when the borrower dies. And that's also true here, that this portion of the debt is extinguished, but Guardian Flight never makes payments out. And what Taylor also recognizes is that that's crucial to the McCarran-Ferguson analysis, because that means that the Congress's central concerns with insurer solvency are not implicated by a debt cancellation program. And the same is true in the case of Guardian Flight's membership. And third, Taylor shows that the district court's approach cannot be affirmed. So the district court focused on two things when it held that the membership program was insurance. First, it said, well, the primary purpose of this is to spread risk. And second, it said the benefits are only triggered if this contingency occurs, an air ambulance transport. But both of those factors were also present to an equal degree in Taylor. The borrower in Taylor shifted onto the bank the risk that she would die before she completed paying out her loan. And at the same time, the benefits under the contract were only triggered if this contingency occurred, if she happened to her premature death before she paid off the loan. And this court recognized in Taylor that that's still not insurance because there's no promise to identify. The district court didn't cite Taylor or acknowledge it. And I think that Taylor completely excludes its rule. And, again, the officials have never drawn any line that would limit states' ability to simply deem products insurance and thereby frustrate federal regulatory priorities. We provided a long list of prepaid service agreements in our opening brief that could be classed as the business of insurance if the district court's rule is discerned. And we have provided a clear rule grounded in the case law of this court and the United States Supreme Court that distinguishes non-insurance products, such as those listed on our brief, from true insurance. That simple rule is that a prepaid service agreement or a debt cancellation agreement is not the business of insurance because there's no promise to indemnify. Ms. Taylor, I know you don't like the walk and talk like a duck analysis, but doesn't this really walk and talk like a duck? I mean, it's a very small fee for what is ultimately going to be a very expensive potential ambulance service. So aren't we really shifting risk here? And isn't that essentially what insurance is all about? Those factors were also present in Taylor, and this court held that that doesn't make it insurance. There was a small upfront fee, and in exchange there was a significant debt, $19,000 in today's money, that would have been canceled upon the occurrence of a contingency that everybody would have regarded as catastrophic and nobody wanted to happen, which was the death of the borrower. But that's not insurance because there's no promise of indemnification, and that's key. It's not just an academic distinction because Guardian Flight will never break a promise to indemnify a member. If it were to go bankrupt, it's going to be in a position to keep the promises that it made. First of all, because it doesn't guarantee the provision of services, if the member is transported by another ambulance company, then under the terms of the membership, Guardian Flight isn't obligated to pay, so its insolvency wouldn't prevent it from keeping any promise that it's made. And if, through some happenstance, Guardian Flight were able to provide that transport, notwithstanding its insolvency, then it's going to keep its promise because it has no contractual right to recover anything more than what it's agreed to under the membership agreement. It can't ask for any out-of-pocket costs. Whereas with a true insurer, you have that promise to indemnify so that when the insured incurs the liability, if the insurer has become insolvent, then the insured is left out in the cold. She has a substantial liability, and the insurer hasn't managed its pot of money that it's supposed to guard, and she goes and makes her claim, and the insurer has to break its indemnification promise. I'll move then to Airline Deregulation Act preemption. So there's a veritable mountain of case law cited in our briefs holding that states can't regulate air ambulance reimbursement rates for membership programs, including this court's decision in Farrell and, again, the Cheatham decision. We don't think that there's even a close question. But above and beyond that case law, I wanted to draw this court's attention to what's happening right now. So in 2018, Congress passed the FAA Reauthorization Act, which reaffirmed, doubled down on Airline Deregulation Act preemption. There were a few competing proposals circulating before that law was passed, and some of them would have altered the operation of the express preemption provision when it comes to air ambulances. But Congress rejected those proposals and instead established this advisory committee. The advisory committee has started meeting, and on that committee are representatives of various stakeholder groups, including the North Dakota Insurance Commissioner, John Gottfried, who is there representing the interests of state insurers. And this group is going to come up with a federal solution to the various issues that people have raised about pricing in the air ambulance industry. And that's exactly what Congress wants to happen, and that's consistent with the Airline Deregulation Act. North Dakota has decided to freelance and try to come up with its own solution to this problem, and that is foreclosed by what Congress's chosen solution is, which is a federal solution that's in process right now with the committee meetings ongoing. And finally, with respect to whether the McCarran-Ferguson Act refers preemption saves the payment provision, every single court of appeals or Supreme Court decision that we are aware of holds that where you have the relationship between either an insured or insurer and a third party, you're outside the business of insurance. The business of insurance is really that relationship, it's uniquely that relationship between the insured and the insurer, the policy relationship. And as soon as a third party is in the picture, that is outside the business of insurance. That's true in national securities, that's true in Royal Drug, that's true in Pareto, that's true in FAFE. And so we don't think we need more. But in this case, we have more, which is Bailey. The statutory scheme at issue in Bailey is indistinguishable in any material way from the statutory scheme at issue in this case. You have the rate provision on the one hand that sets the rate, and then you have a balance billing prohibition, that's the payment prohibition here, that precludes the air ambulance provider from recovering anything above and beyond the rate that's set by the rate provision. And as here, the air ambulance provider in Bailey challenged the balance billing provision. And Bailey had no trouble finding not only that that is preempted by the Airline Deregulation Act, but also that it is not saved by the McCarran-Ferguson Act. Because by the time the balance billing prohibition comes into play, as Judge Schoflat said, the insurer has paid and left the picture. All that's at issue then is whether the air ambulance provider is going to be able to recover anything additional from the insured. And what the Bailey opinion also recognizes, because the officials have made some arguments about how the payment provision may transfer risk, is that to the extent that the transfer of risk is affected by the statute, it's passed on to the provider, not the insurer. And that's not the business of insurance. Requiring the provider to swallow the balance or the cost of providing the transport is not at all part of the relationship between the insured and the insurer, which is the unique focus of the McCarran-Ferguson Act. So we would submit that there's no way to come to a different conclusion consistent, in this case, consistent with Bailey. I'll reserve the remainder of my time. Very well. Thank you, Ms. Taylor. Court will hear from Mr. Phillips. Thank you. May it please the court. My name is David Phillips. I'm arguing today on behalf of the defendants, the North Dakota Insurance Commissioner, John Gottfried, and the North Dakota Attorney General, Wayne Stangel. This case involves two statutes enacted by the North Dakota Legislative Assembly for the purpose of regulating the business of insurance. There's two provisions at issue. I'll talk about both the claim settlement, or sometimes referred to as the payment provision, and the membership or subscription provision. These laws were passed as part of a larger bill, SB 2231, specifically to protect North Dakota insureds from the extremely high bills that they were getting from air ambulance companies that were sending them bills for out-of-pocket expenses uncovered by insurance. The laws were passed specifically to address this problem through insurance regulation. These high bills are the result of a situation where we have an uncompetitive market in which patients who are involved in an accident or otherwise need emergency medical care don't have any meaningful opportunity to choose the service provider in the moment. They don't have any meaningful opportunity to ask for prices or anything like that. So how can the prohibiting balanced billing, how can that be an insurance regulation? It seems to me that has nothing to do with the insurer. It has to do with the relationship between the patient and the air ambulance carrier. Your Honor, I think the relevant question or test here is whether or not the regulation was enacted for the purpose of regulating the business of insurance. I think even you just said that it was enacted for the purpose of stopping balanced billing. Right. And the way that it does that is it creates a benefit for insurance policyholders in North Dakota in that for insurance policyholders, it has in-network rates and prohibits the balanced billing. And so it is enacted for the purpose of regulating those insurance policies. But the insurance company is out of the picture already at that point, isn't it? Out of the picture? In other words, it's the relationship between the provider and the insured at that point. The insurance company is already indemnified under the terms of its policy and as counsel indicated is then out of the picture. Yeah, that may be the case at this stage, but I think it's why it's important that the law itself doesn't have to directly impact the business of insurance or doesn't have to directly be applicable to the business of insurance. It can, under the FABE test, give a benefit to policyholders that drives North Dakota consumers towards traditional health insurance with those consumer protections that are in place. So to the extent that the FABE test applies, this is relevant. Now, the fact that it does involve a relationship here between the care provider and the patient may be relevant to one factor of the Pereno test, which we've argued wouldn't apply or would have limited application. But to the extent it's relevant, it's not a dispositive factor and not the primary focus under the layout that we've given in terms of an analysis of this case. Now, again, it's our position that the test laid out by the United States Supreme Court in Department of Treasury versus FABE is the appropriate test wherein statute escapes preemption to the extent that it protects insurance policyholders. And it has the end intention or aim of adjusting, managing, or controlling the business of insurance. You can see it's a broader category of reverse preempted laws than that applicable to antitrust, which are typically exceptions to antitrust laws would be narrowly construed. So our analysis kind of gives effect to that. It's, you know, this distinction between FABE and Pereno is sometimes recognized by the courts. Sometimes it's glossed over. And I don't say that Pereno is 100% inapplicable in any opinion dealing with a non-antitrust case in that it does help define what the business of insurance is, which is a portion of the test at issue in this case. The test being, you know, was the state law enacted for the purpose of regulating the business of insurance? So the extent of Pereno analysis is included. That's not necessarily wrong, but it's limited to defining the business of insurance, and it isn't the whole question or the whole issue at hand. In terms of, you know, application of the law here, to make sure I have a chance to address it, I'll start with, you know, the membership or subscription provision and the idea that this is claimed not to be insurance. It is our position that the, you know, these subscription plans are, in fact, insurance. There is, you know, there's a number of places that can be looked at. We have cited, you know, North Dakota case law. It is clear based on the McCarran-Ferguson Act that it was the intention of Congress to allow states to regulate in this area. Certainly, this court could look to state law definitions of insurance. I think that the kind of the analogies that are given by opposing counsel and the sort of slippery slope argument that's given, I don't think is really applicable in that we do have a very particular fact scenario or a structure of law at issue in this case. And I think the walks like a duck, quacks like a duck analysis is instructive and useful in that this isn't, you know, a contract similar to the Royal Drug case or the Jordan case where it's a contract between an insurance company and, you know, medical providers where they negotiate lower rates. This isn't that type of a contract. It's a contract directly between Guardian Flight and the person who is seeking to eliminate the risk that they'll have a catastrophic loss. The Taylor case that was hammered on significantly is a debt cancellation situation where somebody owes money to the bank and in the event they die, that debt is canceled. I would suggest that there are some fundamental differences here and I think most people would consider paying less than $100 a year to eliminate the catastrophic loss of potentially $40,000 or more in the event that you need an air ambulance is in the nature of insurance. Importantly, though, under the analysis that we've laid out, it doesn't necessarily have to be the business of insurance to survive under the reverse preemption of McCarran Ferguson in so much as the test is whether or not the law was passed for the purpose of regulating the business of insurance. And North Dakota, through its legislature, outlawed these types of subscription agreements. They're no longer permitted with civil penalties for violation. That is intended to drive consumers away from these types of subscription plans and into traditional insurance with the protections that the North Dakota regulatory structure has. As it is, with these subscription plans being allowed, it creates a competition with health insurance. It takes away all incentive for the insurers to become in network and it potentially encourages individuals to pay something shy of $100 a year to eliminate this one risk and not seek the types of insurance that provide more robust protection. So under our analysis, these types of subscriptions would be insurance. But in any event, the law prohibiting them was passed for the purpose of regulating the business of insurance and therefore survival. Ms. Taylor seems to be arguing, I think, that there's no indemnification going on in these subscription agreements and that that's crucial to the existence of insurance. What's your reaction to that? Well, I disagree that indemnification necessarily means that it is a loss to a third party that is paid for. The North Dakota law that defines insurance, 26.1-29-01, defines insurance as an insurance contract whereby one undertakes to indemnify another against damage or liability arising from an unknown contingent event. I don't believe that that necessarily has to entail a third party in the traditional sense that the insurance company pays a third party on your behalf. This is indemnification for the loss that would occur in the event that you needed an air ambulance and had extreme levels of balance billing. So I would disagree that indemnification in terms of involvement of a third party is 100% necessary. And again, I think the court should look at what this really is, which is paying $100 or less so that you won't get a $40,000 plus bill in the very unlikely event that you're going to need an air ambulance in North Dakota. And I would again defer to the walks like a duck analysis, which is that that appears to be insurance and the court need not go down a slippery slope of other examples. The claims settlement provision is a similar analysis, and again, it's really the same analysis on both provisions applied similarly. In that we would suggest that the FABE test would require you to look at whether or not this provision protects policyholders. In this case, it certainly does. If you are a policyholder in North Dakota, claims have to be settled by your insurance company at in-network rates, and you're protected from these balanced billings. It has the intention of adjusting, managing, or controlling the business of insurance in that, you know, the claim settlement provision dictates the terms that have to be included in the insurance policy and the manner by which the claims are paid. Again, Perino, we would suggest is of limited value or use, but to the extent it's discussed by the court, it still could be looked at in terms of whether or not this involves the business of insurance, which is a portion of the test. And, you know, going through those factors, you know, does this have the effect of transferring or spreading a policyholder's risk? Well, yes, it transfers the risk from North Dakota policyholders onto their insurance company, which is the intent of this and removes the risk of these balanced billings. Is it an integral, you know, part of the policy relationship between the insurer and the insured? Is it limited to entities within the insurance industry? This is one where I would concede it does, you know, the statute does pull in some third parties, and I wouldn't suggest that every single element of the Perino test is met exactly in a satisfactory manner to preserve these laws. But if these factors, to the extent you do apply the Perino test, are nondispositive individually, you need to get a full picture of what these provisions do. Very briefly, was there a question? I'm sorry. Okay. Very briefly, before my time is up, there is some discussion of the FAA Reauthorization Act of 2018 and what that projects in terms of Congress's intent here. The suggestion by opposing counsel in briefing and the like is that this is an intent for Congress to maintain control over this area. We cite some provisions specifically in that act wherein Congress is referencing state insurance regulators being part of a committee and actions that they might be able to take in this area, which suggests that Congress did not intend to eliminate state insurance regulators from this area of lawmaking. And I believe my time ran out. It has indeed. Okay, thank you. Thank you. Thank you, Mr. Phillips. Rebuttal, Ms. Taylor. Just a few points, Your Honor. Thank you. First of all, with respect to, I'll take the last point first, the FAA Reauthorization Act, they refer to the fact that the text of that does contemplate that the federally constituted advisory committee is going to consider what actions states, including state insurance commissioners, can take consistent with current legal authorities. And those current legal authorities have to include the Airline Deregulation Act. Now, there are things that states would do consistent with the ADA. One example would be to enforce network adequacy laws that address insurers not providing adequate coverage for air ambulance transports. That would be focused on the insurance policy itself. But what the states can't do is through their legislature, just do an end run around this process and run around the ADA. With respect to the claims settlement provision, the opposing counsel made the suggestion that if you sort of take a step back, all of this is for the purpose of regulating the business of insurance. Now, FABE doesn't allow you to do that, take a step back. FABE went subsection by subsection in a single Ohio priority statute and asked whether each of those priority provisions affected the relationship between the policyholder and the insurer. And it held that the one that was going to help ensure that claims on an insurance policy got paid was protected by the McCarran-Ferguson Act reverse preemption. But additional ones, including one that would have governed payment to third-party creditors, which would encompass air ambulance providers, for example, that was not saved by the McCarran-Ferguson reverse preemption. But even if you set that aside and you take a step back here, if you look at the overall purpose of this, what this statute does is make us by operation of law effectively an in-network provider. And that is regulating the relationship between the insurer and the air ambulance provider. It is not regulating the relationship between the insurer and the insured. On the ADA, otherwise, they've made some policy arguments, which, again, this court has held in Farrell and Watson are legally irrelevant. And finally, on the membership prohibition, again, they are adhering to their walks like a duck approach. And we would, again, submit that that's entirely foreclosed by Taylor and that it is a slippery slope. There are numerous products where you have a small upfront fee and potentially significant liabilities. For example, the legal Zoom membership. We all know that legal fees can get quite extensive. And yet that so the proportionality test would fail to distinguish there. Again, they haven't proposed a workable rule. This court established a workable rule in Taylor. And that disposes of this case. Thank you. Thank you, Ms. Taylor. Court appreciates your briefing and your arguments today and especially your cooperation with our clerk's office to do it by video. Case will be submitted and decided in due course. Thank you.